20 F.3d 1008
 PACIFIC NORTHWEST VENISON PRODUCERS, a Washington
corporation; Robert V. Baker; James E. Rich; D. Bruce
Morgan; Washington Alternative Livestock Association, a
Washington corporation, Plaintiffs-Appellants,
v.
Curt SMITCH, Director of Washington Department of Wildlife;
Dean A. Lydig, James M. Walton, Mitch Johnson, Terry Karro,
John McGlenn, Norman F. Richardson, Commissioners of the WA
State Wildlife Commission, Washington State Department of
Wildlife, Defendants-Appellees.
 Nos. 92-36766, 92-36953.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1994.
Decided April 1, 1994.
 
 Paul M. Seby, Mountain States Legal Foundation, Denver, CO, and Peter B. Camp, von Kallenbach, Seattle, WA, for plaintiffs-appellants.
 Robert K. Costello, Sr., Asst. Atty. Gen., Olympia, WA, for defendants-appellees.
 Ward Swanser, Moulton, Dellingham, Longo & Mather, Billings, MT, for amicus.
 On Appeal from the United States District Court for the Western District of Washington.
 Before: REAVLEY*, SKOPIL and LEAVY, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 
 1
 Plaintiffs Pacific Northwest Venison Producers and several of its members (collectively, "PNVP") appeal the district court's summary judgment in favor of the Washington Department of Wildlife and the Washington State Wildlife Commission (collectively, "Department of Wildlife" or "Department"), upholding the constitutionality of the Department's regulations banning the private ownership and exchange of several species of wildlife. We affirm.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 In January 1991, the Department of Wildlife promulgated regulations that prohibit the "importation, holding, possession, propagation, sale, transfer or release" of "deleterious exotic wildlife," including mouflon sheep. See Wash.Admin.Code Sec. 232-12-017(1)(d)(iv), -017(2). In June 1992, the Department promulgated emergency regulations which added fallow deer and sika deer to its list of prohibited deleterious exotic wildlife. Wash.St.Reg. 92-14-015 (amending Wash.Admin.Code Sec. 232-12-017(d)(v)). At the same time, the Department promulgated emergency regulations that prohibit the same activities regarding certain native wildlife species, including elk. Id. at 92-14-014 (amending Wash.Admin.Code Sec. 232-23-064(2)). The purported reason for the emergency regulations was to guard against perceived dangers to native wildlife presented by captive herds of these animals.
 
 
 3
 Following the promulgation of the regulations, the Department invited several wildlife experts to speak at a workshop to determine whether these animals actually present risks to native wildlife. The Department invited only experts who had previously expressed concern about the risks that game farms pose to native wildlife. Neither experts who support game farms nor ranchers who raise the prohibited wildlife were allowed a hearing to present evidence to counter the concerns raised at this workshop.
 
 
 4
 The experts at the workshop identified several risks to native wildlife presented by game farms. First, the importation of any animals presents a risk of importing diseases such as tuberculosis and brucellosis. Animals carrying the disease can infect native wildlife either after escaping, or through fenceline transmission.
 
 
 5
 Second, importation of animals presents some risk of importing the parasitic meningeal worm. This parasite is fatal to all cervids except the white-tail deer, which acts as a carrier. Scientists have not conclusively established whether other cervids are able to carry and pass on the meningeal worm in low numbers that are difficult to detect. The meningeal worm has not yet been found west of the Great Plains, possibly because the drier interior of the continent is not amenable to its secondary hosts, snails and slugs. Some experts fear that if a white-tail deer were to pick up the meningeal worm from an animal imported from the East, the parasite could spread rapidly within the white-tail deer population, and eventually decimate populations of other cervids.
 
 
 6
 Third, captive herds present the possibility that groups of animals might escape and become free-ranging herds, competing with native wildlife for forage and habitat. Finally, game farms present risks that escaped animals will breed with wild animals and affect the genepool of Washington's native wildlife.
 
 
 7
 PNVP, an agricultural cooperative of commercial game farms in Washington, Oregon, and British Columbia, filed this lawsuit shortly after the emergency regulations were promulgated, challenging the regulations as applied to elk, mouflon sheep, sika deer, and fallow deer. On summary judgment, the district court held that the regulations do not violate the Commerce Clause, substantive due process, or equal protection, but that the Department violated plaintiffs' procedural due process rights by failing to provide them with a hearing. The court also ruled that the federal Endangered Species Act preempted the state regulation banning the propagation of subspecies of sika deer that are federally listed endangered species. PNVP appeals the district court's judgment on the Commerce Clause ground only.
 
 DISCUSSION
 1. Mootness
 
 8
 The emergency regulations covering elk, sika deer, and fallow deer have expired since the district court filed its order, raising the possibility that this appeal has become moot as to these animals. The Department of Wildlife has now promulgated permanent regulations which are essentially the same as the emergency regulations, however, see Wash.Admin.Code Secs. 232-12-017(1)(d), -017(2), -064(2), except that they do not prohibit commerce in fallow deer, id. Sec. 232-12-017(7), or federally listed endangered species, id. Sec. 232-12-017(6). Therefore, this appeal is not moot as to the prohibitions of elk and sika deer. See Bunker Ltd. Partnership v. United States, 820 F.2d 308, 312 (9th Cir.1987).
 
 
 9
 The Department's permanent regulations added a provision which allows commerce in fallow deer to continue. Wash.Admin.Code Sec. 232-12-017(7). Although PNVP argues that the permanent regulations contain provisions that also impermissibly burden commerce, only the constitutionality of a total ban was addressed by the district court and by the parties on appeal. We therefore decline to address the constitutionality of the new regulation regarding fallow deer.
 
 
 10
 Since the regulations no longer ban fallow deer, this appeal is moot as to that species. See Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 911 F.2d 1331, 1335 (9th Cir.1990), cert. denied, 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991). We thus address only the constitutionality of the regulations as applied to elk, mouflon sheep, and sika deer.
 
 
 11
 2. Discriminatory Versus Evenhanded Regulations
 
 
 12
 The United States Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States ..." U.S. Const. Art. I, Sec. 8. Even in areas where Congress has not exercised this authority, state regulations may violate the Commerce Clause either because the regulations discriminate against interstate or foreign commerce, or because they incidentally affect such commerce. If the regulations discriminate in favor of in-state interests, the state has the burden of establishing that a legitimate state interest unrelated to economic protectionism is served by the regulations that could not be served as well by less discriminatory alternatives. See Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). In contrast, if the regulations apply evenhandedly to in-state and out-of-state interests, the party challenging the regulations must establish that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the putative local benefits. See Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas, 489 U.S. 493, 525-26, 109 S.Ct. 1262, 1281-82, 103 L.Ed.2d 509 (1989); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981).
 
 
 13
 PNVP contends that two provisions demonstrate that the Department of Wildlife regulations are discriminatory. The first is the inclusion of "importation" in the list of prohibited activities. Wash.Admin.Code Secs. 232-12-017(2), -064(2). The second is the "grandfather clauses," which allow owners to keep animals already legally present within the state. Id. Secs. 232-12-017(4)(b), -064(8).
 
 
 14
 a. The Ban on Importation
 
 
 15
 PNVP argues that any state prohibition of imports or exports is per se discriminatory. The Supreme Court has stated that "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978) (internal citations omitted) (state may not ban importation of solid waste while allowing disposal of in-state waste).
 
 
 16
 Relying on this language, the Tenth Circuit has held that state regulations banning the importation of certain wildlife species are per se discriminatory, regardless of the overall regulatory scheme. Dorrance v. McCarthy, 957 F.2d 761, 765 (10th Cir.1992). We respectfully disagree. In practical effect, the importation ban adds nothing to the prohibitions that apply equally to in-state and out-of-state interests, because animals could not be imported if they are not allowed to be held, possessed, transferred, or sold once inside the state. An import ban that simply effectuates a complete ban on commerce in certain items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items. See Chemical Waste Management, Inc. v. Hunt, --- U.S. ----, ---- - ----, 112 S.Ct. 2009, 2016-17, 119 L.Ed.2d 121 (1992) (discussing quarantine laws).
 
 
 17
 The guiding principle in determining whether a state regulation discriminates against interstate or foreign commerce is whether either the purpose or the effect of the regulation is economic protectionism. See Philadelphia, 437 U.S. at 623-24, 98 S.Ct. at 2535. The regulations at issue here clearly are not fueled by economic protectionism, nor do they result in the citizens of Washington receiving benefits that are denied to others. The ban on importation thus does not make these regulations discriminatory.
 
 
 18
 b. The Grandfather Clauses
 
 
 19
 PNVP does not challenge the grandfather clauses in and of themselves; they are at issue only as far as they impact on our analysis of the overall regulatory scheme. These clauses allow Washington residents to continue to possess and sell animals that were legally held within the state prior to the passage of the regulations. Wash.Admin.Code Secs. 232-12-017(4)(b), -064(8). Propagation of these animals, however, is prohibited. Id. Secs. 232-12-017(4)(e)-(f), -064(8)(c), -064(8)(f).
 
 
 20
 Such exceptions may "weaken the presumption in favor of the validity of the general [prohibition], because they undermine the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce." Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 447, 98 S.Ct. 787, 797, 54 L.Ed.2d 664 (1978). In this case, however, plaintiffs include Washington residents who have introduced extensive evidence that the grandfather clauses do very little to protect their economic investments. Plaintiffs have actively pursued political remedies within the state, and have to some extent prevailed in the political forum by lifting the ban on fallow deer. In addition, the exceptions are perhaps the only reasonable means of working toward the evenhanded prohibition of all privately owned animals of the affected species. Because the considerations that would weigh in favor of a heightened scrutiny are absent, we apply the test for evenhanded regulations with incidental burdens on interstate and foreign commerce. See Clover Leaf Creamery, 449 U.S. at 473 n. 17, 101 S.Ct. at 728 n. 17.
 
 3. Summary Judgment
 
 21
 Summary judgment is appropriate "if the pleadings ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might allow judgment in favor of the party opposing summary judgment. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987). The mere existence of disputed facts does not preclude summary judgment. If the nonmoving party could not prevail even if the factfinder accepts all of its evidence as true, the moving party is entitled to summary judgment. All reasonable inferences from the evidence must be made in favor of the nonmoving party. Id. at 631.
 
 
 22
 PNVP argues that it raised issues of material facts as to whether the state had legitimate interests that are addressed by the regulations, and whether the regulations' burden on interstate and foreign commerce is clearly excessive in relation to the state's interests. PNVP further argues that it has raised material factual issues regarding available alternatives that would protect the state's interests as well, which could affect the determination of whether the burdens on commerce are excessive.
 
 
 23
 a. The State's Interests
 
 
 24
 The state's putative interests to be served by these regulations are to protect its native wildlife from diseases and parasites, to maintain the genetic purity of its wildlife, to protect its wildlife from competition for forage and habitat, and to ensure that native wildlife will not be captured and added to captive herds. Clearly, the protection of wildlife is one of the state's most important interests. See Hughes v. Oklahoma, 441 U.S. 322, 337, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (state interest in protection of wild animals is similar in importance to interest in protecting health and safety of citizens). PNVP argues, however, that this is not the real purpose behind the regulations, and speculates that the real reason for the regulations is traditional antipathy of wildlife biologists toward game farming.
 
 
 25
 PNVP has failed to offer evidence that could legally support an inference that the Department was not actually concerned about the health of Washington's wildlife. PNVP argues that other species that might as easily transmit the diseases and parasites that concern the Department have not been banned, and that from this fact, the district court was required to make the inference in PNVP's favor that the state's interest was not actually in the health of its wildlife. But the Supreme Court has long held that the fact that a state regulation addresses only one aspect of a problem does not alone cast doubt on the state's motivation. See Clover Leaf Creamery, 449 U.S. at 466, 101 S.Ct. at 725 (citing equal protection cases), 473 (incorporating discussion of state's interest for equal protection analysis into Commerce Clause analysis). Thus, the district court could not infer that the state's purported interests were not its actual interests based on the state's failure to prohibit other carriers of diseases. See T.W. Elec. Serv., 809 F.2d at 631 (inference may be drawn only if reasonable and permissible under governing substantive law).
 
 
 26
 PNVP also argues that the Department could not actually be interested in genetic purity because the state formerly released animals imported from out of state to supplement its native herds. However, PNVP fails to present any reason, either legal or factual, why the court could reasonably disbelieve the Department simply because current policy makers disagree with past policy makers as to the desirability of releasing non-indigenous animals into the wild. PNVP has thus failed to offer legally sufficient evidence from which a factfinder could infer that the state's putative interests were not its actual interests.
 
 
 27
 b. Burdens On Interstate and Foreign Commerce
 
 
 28
 PNVP also argues that it has shown an issue of material fact as to whether the regulations' impacts on interstate and foreign commerce are clearly excessive in relation to the putative benefits. As an initial matter, we must determine whether the impacts on foreign commerce are subject to a higher standard than that generally applied to regulations that burden interstate commerce. PNVP's Foreign Commerce Clause argument is based on the exchange of animals for breeding between British Columbia and Washington, the shipping of animals from British Columbia to Washington for slaughter, and the importation of semen from New Zealand.
 
 
 29
 The Supreme Court has indicated that when state regulations affect foreign commerce, additional scrutiny is necessary to determine whether the regulations "may impair uniformity in an area where federal uniformity is essential," Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 448, 99 S.Ct. 1813, 1821, 60 L.Ed.2d 336 (1979), or may implicate "matters of concern to the whole nation ... such as the potential for international retaliation." Kraft General Foods v. Iowa Dep't of Revenue, --- U.S. ----, ----, 112 S.Ct. 2365, 2370, 120 L.Ed.2d 59 (1992).
 
 
 30
 This is not a matter in which national uniformity is important. Most states and Canadian provinces ban some species of wildlife, and the lists of prohibited species vary widely. Compare, e.g., Mont.Admin.R. 12.6.1515(5)-(6) with Idaho APA 13.01.10 Secs. 700.03, 701. PNVP has offered no evidence that differing regulations in the various states create any particular difficulties for those who export these animals from other countries.
 
 
 31
 PNVP has suggested no other reason why international commerce in these animals might be of concern to the whole nation. In light of the fact that many borders, including those of Alberta and British Columbia, are already closed to these animals due to the very risks that concern the Washington Department of Wildlife, it is difficult to see how Washington's ban on importation would offend foreign nations. Because the concerns that would weigh in favor of a higher burden on the Department due to the regulations' impact on foreign commerce are absent here, we analyze the burden on foreign commerce in the same manner that we analyze the burden on interstate commerce.
 
 
 32
 In Pike v. Bruce Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court articulated the balancing test used to determine whether evenhanded state laws and regulations are valid under the Commerce Clause:
 
 
 33
 Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 34
 Id. at 142, 90 S.Ct. at 847 (internal citations omitted).
 
 
 35
 Regulations promulgated pursuant to the state's interest in the preservation of its wildlife carry a strong presumption of validity. See Bibb v. Navajo Freight Lines, 359 U.S. 520, 524, 79 S.Ct. 962, 964, 3 L.Ed.2d 1003 (1959). To defeat the Department's motion for summary judgment, PNVP was required to show that it could offer evidence at trial legally sufficient to support a determination that the impacts of the regulations on interstate and foreign commerce are so great that they outweigh this vital state interest. Evidence that interstate and foreign commerce is in some way affected by the regulations is not enough to meet this burden; what is required is evidence that these effects are of a type or an extent that could support a determination that they are "clearly excessive" in relation to the state's interest in the health of its native wildlife. See Anderson v. Liberty Lobby, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (plaintiff must produce evidence sufficient to support a jury verdict); New York State Trawlers Assoc. v. Jorling, 16 F.3d 1303, (2d Cir., 1994). PNVP has failed show that it could produce such evidence.
 
 
 36
 A review of recent Supreme Court cases reveals that certain types of impacts on interstate commerce are of special importance in the balance with the state's putative interest. These impacts include the disruption of travel and shipping due to a lack of uniformity in state laws, see Raymond Motor, 434 U.S. at 445, 98 S.Ct. at 796; Bibb, 359 U.S. at 526-27, 79 S.Ct. at 966; impacts on commerce beyond the borders of the defendant state, see Healy v. Beer Institute, 491 U.S. 324, 337, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989); and impacts that fall more heavily on out-of-state interests, see Clover Leaf Creamery, 449 U.S. at 473, 101 S.Ct. at 728. Because the purpose of the Commerce Clause is to protect the nation against economic Balkanization, Wardair Canada v. Florida Dep't of Revenue, 477 U.S. 1, 7, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986), legitimate regulations that have none of these effects arguably are not subject to invalidation under the Commerce Clause. See Clover Leaf Creamery, 449 U.S. at 473, 101 S.Ct. at 728 (applying "clearly excessive" test only after "granting that the out-of-state ... industry is burdened relatively more heavily than the [in-state] industry"); New York State Trawlers, 16 F.3d at 1308 ("incidental burdens are the burdens on interstate commerce that exceed the burdens on intrastate commerce"); Old Bridge Chemicals v. New Jersey Dep't of Environmental Protection, 965 F.2d 1287, 1295 (3d Cir.) (only discriminatory burdens are considered in balancing test), cert. denied, --- U.S. ----, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992); Amanda Acquisition Corp. v. Universal Foods Corp., 877 F.2d 496, 507 (7th Cir.) (in absence of discrimination, "argument that Wisconsin's law hinders the flow of traffic 'too much' " foreclosed by Supreme Court precedent), cert. denied, 493 U.S. 955, 110 S.Ct. 367, 107 L.Ed.2d 353 (1989). Contra Dorrance, 957 F.2d at 764 (nondiscriminatory burdens included in balancing test).
 
 
 37
 Not only has PNVP failed to show that the regulations may have impacts of federal concern, it also has failed to offer evidence that could support a finding of anything more than a minimal economic impact on interstate or foreign commerce. Although the summary judgment record describes the nature of the impacts on interstate and foreign commerce (i.e., foreclosure of the exchange of breeding stock between Washington and other states and Canada, the purchase of semen from New Zealand, and the importation of animals from British Columbia and Oregon for slaughter), the record lacks any indication of the extent of the commercial activities that have been foreclosed. PNVP has offered no evidence indicating how many animals were previously shipped to Washington from British Columbia and Oregon. We do not know if movement of animals between Washington and other states and countries is valued in hundreds of dollars per year (or less) or in hundreds of thousands of dollars per year (or more). Most importantly, PNVP has offered no evidence that these regulations will have any economic effect on consumers or members of the industry in other states and countries. PNVP has simply failed to show that it can produce any evidence that could support a holding that the regulations' impact on interstate and foreign commerce is clearly excessive in relation to an interest as important as the protection of native wildlife. Cf. Burlington Northern Ry. Co. v. Department of Public Serv. Reg., 763 F.2d 1106, 1114 (9th Cir.1985); New York State Trawlers, 16 F.3d at 1308.
 
 
 38
 Finally, PNVP argues that it has offered evidence that less burdensome alternatives would protect the state's wildlife as well as the regulations do. Because "the extent of the burden that will be tolerated" depends in part on whether the state's interest "could be promoted as well with a lesser impact on interstate activities," see Pike, 397 U.S. at 142, 90 S.Ct. at 847, such evidence may create a material dispute as to whether the burden on interstate commerce outweighs the state's interest. While the lack of evidence as to what the extent of the burden is makes the determination of "the extent of the burden that will be tolerated" problematic, we proceed on the assumption that overwhelming evidence that the regulations are unnecessary could add enough force to the mere existence of burdens on interstate commerce to overcome the presumption that the regulations are valid.
 
 
 39
 PNVP's suggested alternatives include testing for diseases and parasites, quarantine for the length of time that it takes to establish whether an animal has a particular disease or parasite, tagging to ensure that animals are not imported from the East, heavy fencing to prevent escapes, and increased law enforcement. PNVP has offered evidence in the form of expert opinions that these alternatives combined with the alleged propensity of animals to return after escaping can adequately reduce the risks to native wildlife.
 
 
 40
 The bulk of the evidence offered by PNVP consists of expert affidavits stating that the increase in risks present in its proposed alternatives is acceptable when considered against the regulations' effect of foreclosing the commercial movement of these animals in and out of Washington. How much risk to wildlife is acceptable, however, is quintessentially a legislative determination. It is the role of the state, and not of the courts, to determine how much risk to the state's wildlife is acceptable in the balance with private economic interests. Nonetheless, we assume that at some point the risks presented by proposed alternatives as compared to challenged regulations would be so small that courts should not give them credence. PNVP has arguably offered evidence that could support a finding that its proposed alternatives would reduce the risks to that point.
 
 
 41
 There are significant gaps in PNVP's offering, however. In particular, PNVP has produced very little to counter the Department's expert affidavits stating that alternatives similar to those proposed by PNVP have proven ineffective in other states and provinces due to accidents and illegal activity. In response to the Department's expert affidavits alleging extensive and specific facts showing that these animals have a tendency to escape regardless of the measures taken to secure them, and that they often are never recovered, PNVP offered an expert's unsupported opinion that animals have a propensity to return to their captive herds and to a ready supply of food. In response to the Department's affidavits describing illegal activity that has occurred in other states and provinces, including the alteration of tags in order to bring animals in from the East and the capture of wild free-ranging elk to supplement captive herds, PNVP experts opine that increased law enforcement efforts would eliminate the threat of such activity.
 
 
 42
 We doubt that these expert opinions as to the efficacy of PNVP's proposed alternatives could support a factual finding in PNVP's favor. See In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir.1989) ("where the evidence is as clear as that in this record, the court is not required to defer to the contrary opinion of plaintiffs' 'expert' "), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). We need not decide whether the offered evidence could support a determination that the proposed alternatives would serve the state's interests as well as the Department's regulations, however, because the evidence is too inconclusive to have a significant effect on the balance between the burdens on interstate commerce and the state's putative interests. If the determination could not, as a matter of law, tip the balance against the Department, the issue is not material to the outcome of the case.
 
 
 43
 Here, the tenuousness of PNVP's offered evidence is dispositive. When the evidence as to the efficacy of proposed alternatives is as disputed and as inconclusive as it is in this case, it would simply be inappropriate for a court to substitute its judgment for that of the Department of Wildlife in deciding which expert testimony to credit. Particularly when the extent of the risks is in dispute, the Department is clearly permitted to err on the side of excess in taking precautionary measures:
 
 
 44
 [The state] has a legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible. The constitutional principles underlying the commerce clause cannot be read as requiring the State ... to sit idly by and wait until potentially irreversible environmental damage has occurred ... before it acts to avoid such consequences.
 
 
 45
 Maine v. Taylor, 477 U.S. at 148, 106 S.Ct. at 2452 (internal quotation omitted).
 
 
 46
 Even in the context of dormant commerce clause analysis, the Supreme Court has frequently admonished that courts should not "second-guess the empirical judgments of lawmakers concerning the utility of legislation." CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (citation omitted). The Supreme Court has never held that its approach of considering equally effective alternatives in the balance between the burden on commerce and the state's interest negates the state's role in deciding how certain the effectiveness of those alternatives must be in order to be acceptable. To the contrary, in Maine v. Taylor, the Court stated that although the plaintiffs had presented expert testimony that a ban on imports was not required to protect native baitfish, the record in that case probably could not support a finding that the proposed alternatives were equally effective, in light of the uncertainty as to whether diseases carried by imported baitfish might prove dangerous. See id. at 146-48, 106 S.Ct. at 2451-52.
 
 
 47
 Only if PNVP were able to conclusively establish that its alternatives would eliminate risks to native wildlife could we overturn the Department's decision to err on the side of safety. Cf. Raymond Motor, 434 U.S. at 447-48, 98 S.Ct. at 797 (regulation overturned where evidence was "overwhelmingly one-sided" that it did not contribute to state's putative interest). It is clear from the summary judgment record that such conclusiveness is not possible in this case.
 
 CONCLUSION
 
 48
 Plaintiffs in this case have expended considerable time and money in an economic endeavor, only to have their state government subsequently deem that endeavor to be potentially harmful, and therefore prohibited. We note that the district court held that the federal constitution provides some protection in such a situation through its guarantees of procedural due process and of just compensation for the taking of property. In the absence of evidence either of economic protectionism on the part of the state, or of substantial burdens on interstate or foreign commerce, however, we must conclude that the Commerce Clause does not protect their economic investment against legitimate state regulations protecting native wildlife.
 
 
 49
 AFFIRMED.
 
 
 
 *
 The Honorable Thomas M. Reavley, Senior Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation