48 F.3d 391
 40 ERC 1289, 63 USLW 2520, 25 Envtl.
L. Rep. 20,867
 KLEENWELL BIOHAZARD WASTE AND GENERAL ECOLOGY CONSULTANTS,
INC., a corporation, Plaintiff-Appellant,
v.
Sharon L. NELSON, Chairman; Richard D. Casad, Commissioner;
A.J. Pardini, Commissioner; Acting in Their Official
Capacity as Members of the Washington Utilities and
Transportation Commission, Defendants-Appellees.
 Nos. 93-35546, 93-35897.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1994.
Decided Feb. 9, 1995.
 
 James T. Johnson, Seattle, WA, and Mark E. Kauffelt, Charleston, WV, for plaintiff-appellant.
 Steven W. Smith, Asst. Atty. Gen., Olympia, WA, for defendants-appellees.
 Appeals from the United States District Court for the Western District of Washington.
 Before: WRIGHT, TANG and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Kleenwell Biohazard Waste and General Ecology Consultants, Inc. ("Kleenwell") appeals the district court's denial of a preliminary injunction and subsequent grant of summary judgment in favor of Sharon Nelson, Richard Casad, and A.J. Pardini, members of the Washington Utilities and Transportation Commission (collectively "the WUTC" or "the Commission"), in this 42 U.S.C. Sec. 1983 action. Kleenwell claims that the state requirement that it obtain a certificate of public convenience and necessity from the WUTC in order to collect and transport medical waste violates the Commerce Clause because Kleenwell engages in interstate waste transportation.
 
 
 2
 We reject Kleenwell's contention that the state may not impose a certification requirement upon a firm engaged in interstate commerce. Accordingly, we affirm the district court's decision to deny Kleenwell's request for a preliminary injunction and to grant the WUTC's motion for summary judgment.
 
 FACTS
 
 3
 Kleenwell is a Washington corporation with all of its facilities located within the state. From 1989 to 1993, Kleenwell operated a medical waste collection and disposal service in the King County area, the most densely populated region of Washington. Kleenwell collected medical waste from customers and transported it to a rented warehouse, where the company stored it for up to 90 days before disposing of it.
 
 
 4
 In 1990 Kleenwell applied to the WUTC for a certificate of public convenience and necessity pursuant to RCW 81.77.040. As part of a comprehensive statutory scheme designed to ensure universal waste collection service in the state of Washington, all common carriers that collect, haul, and transport solid waste must obtain such a certificate.[1] Kleenwell's application was denied.
 
 
 5
 At the time that Kleenwell applied for the certificate, it disposed of waste within Washington state. After the denial, Kleenwell began transporting waste to California for disposal. In January 1992, the WUTC imposed a penalty assessment of $6,000 against Kleenwell for sixty violations of the rule against operating without the required certificate. Kleenwell asserted that the assessment was invalid, stating that "the transportation in question is interstate in nature."
 
 
 6
 In April 1992, the WUTC served Kleenwell with a complaint, order, and notice of hearing initiating a "classification proceeding" pursuant to RCW 81.04.510 to determine (1) whether Kleenwell was operating a solid waste removal company without the required certificate, and (2) whether Kleenwell was exempt from state regulation because it engaged in interstate commerce. The proceedings were adversarial and conducted before an Administrative Law Judge ("ALJ") from the State Office of Administrative Hearings, an independent state agency. After hearing testimony from both parties, as well as from intervenor waste disposal companies, the ALJ entered an initial order stating that the requirement that Kleenwell obtain a certificate of convenience and necessity did not violate the Constitution. Finally, on January 25, 1993, the WUTC ordered Kleenwell to cease and desist operations until it obtained a certificate.
 
 
 7
 Kleenwell did not appeal the WUTC's ruling to the Washington state courts and has not reapplied for certification. Instead, in April 1993, Kleenwell filed suit in federal district court, seeking preliminary and permanent injunctions to prohibit the WUTC from interfering with its waste transportation activities.[2] The district court denied Kleenwell's motion for a preliminary injunction and subsequently granted the WUTC's motion for summary judgment. It ruled that the doctrine of collateral estoppel barred Kleenwell from relitigating the facts found by the WUTC in the earlier administrative proceedings and, on the basis of those facts, it held that the WUTC's imposition of a certificate requirement did not violate the Commerce Clause. Kleenwell timely appeals.
 
 ANALYSIS
 
 8
 Before reaching the merits of Kleenwell's constitutional appeal, we must first address two threshold questions. First, should this court abstain from hearing Kleenwell's suit pursuant to the principles first set out in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)? Second, did the district court err in holding that the factual findings of the administrative law judge have a preclusive effect upon the federal court proceeding?
 
 I. Abstention
 
 9
 The WUTC asserts, for the first time on appeal, that Younger requires this court to abstain from considering Kleenwell's claim. Under Younger and its progeny, federal courts should abstain from intervening in pending state judicial proceedings out of deference to the interests of comity and federalism. See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 626-27, 106 S.Ct. 2718, 2722-23, 91 L.Ed.2d 512 (1986). Although Younger itself involved pending state criminal proceedings, later cases have extended its reasoning to require abstention in favor of certain state administrative proceedings. See id. Relying on such cases, the WUTC asserts that Kleenwell's decision to file a federal court action, rather than appealing the WUTC's adverse administrative decision to the Washington state courts, represents sufficient grounds for invoking Younger. The WUTC invites us to hold that Younger applies even when the relevant state administrative proceedings have been terminated, a holding that would conflict with the decisions of two other circuits. See CECOS Int'l, Inc. v. Jorling, 895 F.2d 66, 72 (2d Cir.1990); Thomas v. Texas State Bd. of Medical Examiners, 807 F.2d 453, 456 (5th Cir.1987).
 
 
 10
 We need not address the merits of the WUTC's Younger claim, however, because the Commission did not raise this issue before the district court.[3] The Supreme Court has explicitly stated that, even when state administrative proceedings are pending at the time, "[a] State may ... voluntarily submit to federal jurisdiction even though it might have had a tenable claim for abstention." Dayton Christian Schools, 477 U.S. at 626, 106 S.Ct. at 2722.[4] Indeed, the Court noted that a state waives its right to raise Younger on appeal when, as here, it "expressly urge[s] ... the District Court to proceed to an adjudication of the constitutional merits." Id. Accordingly, we hold that the state effectively waived its claim for Younger abstention, and we decline to address it.
 
 
 11
 II. The Preclusive Effect of the WUTC Factual Findings
 
 
 12
 Kleenwell asserts that we should not reach the merits of the district court's decision on the ground that the court erred in giving preclusive effect to the factual findings of the WUTC administrative proceeding. Kleenwell thus asserts that we should reverse the district court's decision and remand for further factual inquiry. We disagree.
 
 
 13
 The Supreme Court outlined the standard for determining whether the factual findings of a state administrative proceeding should be given preclusive effect in federal court. In ruling upon a section 1983 claim, the Court held that
 
 
 14
 when a state agency "acting in its judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.
 
 
 15
 University of Tennessee v. Elliott, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986) (quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966)).
 
 
 16
 It is clear that the WUTC hearing met the requirements of Elliott. The administrative proceeding concerned issues properly before the WUTC. See RCW 81.04.110 (authorizing the initiation of a complaint by the WUTC against a common carrier), 81.04.510 (providing that whether a person is conducting business in the state without the WUTC's approval is a question of fact to be determined by the WUTC), and 81.77.100 (allowing the WUTC to consider whether a regulation violates the Constitution and to construe it accordingly). In addition, the hearing was an adjudicative proceeding that provided an adequate opportunity for both parties to present their cases. It was conducted in accordance with the state APA guidelines for adjudicative proceedings and the WUTC's rules of practice and procedure, and it was presided over by an administrative law judge from the independent State Office of Administrative Hearings. Moreover, the parties were provided with proper notice and an opportunity to be heard, they were represented by counsel, briefs were filed, evidentiary objections were made, exhibits were admitted into evidence, and direct testimony and cross examination were allowed.
 
 
 17
 It is equally clear that the factual findings of the WUTC proceeding would be given preclusive effect in the state of Washington. In Shoemaker v. City of Bremerton, 109 Wash.2d 504, 745 P.2d 858 (1987), the Washington Supreme Court set forth the standard for determining when a state administrative agency's factual findings should bind the parties in a subsequent state court proceeding. It held that the findings of the Civil Service Commission had preclusive effect upon subsequent state proceedings because the determination " 'entailed the essential elements of adjudication.' " Id. 745 P.2d at 861 (quoting Restatement (Second) of Judgements Sec. 83).[5] The court based its decision upon the fact that, as here, adequate notice was given to all the parties, evidence was introduced, witnesses were cross-examined, and counsel had an opportunity to formulate the legal and factual issues before the administrative agency. Id. at 862. Because the WUTC hearing met the requirements of Elliott and Shoemaker, we hold that the district court did not err in giving the WUTC's factual findings preclusive effect.
 
 
 18
 III. The Washington Regulation and the Commerce Clause
 
 
 19
 We now turn to the merits of Kleenwell's claim. Although we review the district court's denial of the request for an injunction under a different standard than we review its grant of summary judgment,[6] both decisions hinge upon the merits of Kleenwell's claim that the Washington regulation violates the Commerce Clause. Accordingly, we begin our discussion with an analysis of this contention.
 
 
 20
 The Supreme Court has distinguished between two types of state regulations burdening interstate commerce: (1) those that directly burden interstate commerce or that discriminate against out-of-state interests and (2) those that burden interstate transactions only incidentally. Regulations that fall into the first category are generally struck down unless the state can demonstrate that a legitimate local interest unrelated to economic protection is served by the regulation and no less discriminatory alternative exists, see Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925); see also Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), while those in the second are subjected to the Pike balancing test. See Pike v. Bruce Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); see also Brown-Forman Distillers v. New York Liquor Authority, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986).
 
 A. Kleenwell's Argument
 
 21
 Kleenwell insists that the first line of cases, specifically Buck v. Kuykendall, 267 U.S. 307, 315-16, 45 S.Ct. 324, 325-26, 69 L.Ed. 623 (1925), should control this decision. In Buck, the Supreme Court found that a requirement that interstate transporters obtain a certificate of convenience and necessity in order to use a highway between two states served no legitimate local purpose and was intended to prohibit competition. For these reasons, the Supreme Court held that the statute was unconstitutional, reasoning that "[i]ts effect upon such commerce is not merely to burden but to obstruct it." Id. at 315, 45 S.Ct. at 326. Kleenwell maintains that the Buck line of cases stands for the proposition that a state may never require a certificate of necessity from any party engaged in interstate commerce, even if the requirement represents an incidental consequence of the state's attempt to address a legitimate local concern. Kleenwell also asserts that the Buck line of cases requires us to invalidate the state requirement because these decisions forbid "direct" regulation of interstate commerce. According to Kleenwell, Washington has "directly" regulated interstate commerce because it has promulgated regulations that concretely affect a business engaged in interstate commerce. We disagree with both contentions.
 
 
 22
 First, Kleenwell's assertion that Buck establishes a per se rule against regulations like the one before us is undermined by three Supreme Court cases upholding the constitutionality of regulations requiring interstate businesses to obtain state permits. In TV Pix, Inc. v. Taylor, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970) (per curiam), the Supreme Court affirmed a district court's decision upholding a state's imposition of a certification requirement upon an interstate company that operated a community antenna television business. In Eli Lilly & Co. v. Sav-On-Drugs, Inc., 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), the Court upheld a requirement that an interstate drug company must obtain a certificate in order to conduct business in the state and to maintain a breach-of-contract action arising from business within the state. Finally, in C.A. Bradley v. Public Utilities Comm'n of Ohio, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933), it upheld the constitutionality of a state order denying a common carrier a certificate to engage in interstate commerce when the primary purpose of the regulation was to promote public safety.
 
 
 23
 Second, under Kleenwell's expansive interpretation of the term "direct," virtually any regulation of local markets, including those that our court and the Supreme Court have upheld, would violate the Commerce Clause. Such an interpretation would, for example, appear to invalidate the Supreme Court's decision in Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), in which it upheld a statute that prevented producers or refiners of petroleum products from operating retail service stations within the state on the ground that the statute served the state's legitimate interest in correcting inequities in the distribution and pricing of gasoline. Similarly, Kleenwell's approach to the Commerce Clause would undermine our holding in Hass v. Oregon State Bar, 883 F.2d 1453 (9th Cir.1989), cert. denied, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990), in which we upheld a resolution requiring all active Oregon-based attorneys to purchase primary malpractice insurance from the state bar association because the provision furthered the state's legitimate interest in remedying the "failure in the unregulated market" and in "ensuring universal malpractice coverage" at reasonable rates. Id. at 1463.
 
 
 24
 Were we to adopt Kleenwell's interpretation of the term "direct," we would, in effect, expand the term until it applied to any regulation that affects interstate commerce. It is clear, however, that the Supreme Court used the term "direct" to refer to regulations whose central purpose is to regulate commerce, usually in order to benefit local interests. We find no evidence that the Supreme Court intended Buck and its progeny to invalidate state regulations whose primary purpose is to address a legitimate local concern and whose incidental effect is to regulate interstate commerce.
 
 
 25
 To the contrary, in Bradley the Supreme Court explicitly rejected the interpretation of the Commerce Clause that Kleenwell urges us to adopt:
 
 
 26
 It is contended that an order denying to a common carrier by motor a certificate to engage in interstate transportation necessarily violates the Commerce Clause. The argument is that under the rule declared in Buck v. Kuykendall, 267 U.S. 307 [45 S.Ct. 324] and Bush & Sons Co. v. Maloy, 267 U.S. 317 [45 S.Ct. 326, 69 L.Ed. 627], an interstate carrier is entitled to a certificate as of right; and that hence the reasons for the commission's refusal and its purpose are immaterial.... But [in those cases], promotion of safety was merely an incident of the denial. Its purpose was to prevent competition deemed undesirable.... In the case at bar, the purpose of the denial was to promote safety; and the test employed was congestion of the highway. The effect of the denial upon interstate commerce was merely an incident.
 
 
 27
 Bradley, 289 U.S. at 95, 53 S.Ct. at 578 (emphasis added).[7]
 
 
 28
 The Supreme Court's observation in Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), also undermines the interpretation that Kleenwell invites us to adopt by clarifying that the state may, in its effort to address legitimate local concerns, regulate interstate commerce as long as the regulation is not unduly burdensome. The Court noted:
 
 
 29
 it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.... When the regulation of matters of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation ... such regulation has been generally held to be within state authority.
 
 
 30
 Southern Pacific Co., 325 U.S. at 767, 65 S.Ct. at 1519; see also Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981) (quoting Southern Pacific Co.).
 
 
 31
 Finally, Kleenwell's claim that the regulation before us "directly" burdens interstate commerce hinges upon the fact that the regulation denies Kleenwell full and unrestricted access to the local market rather than upon evidence that the interstate market as a whole, or out-of-state firms in particular, are burdened by the regulation. The Supreme Court has explicitly rejected the notion that any regulation that affects particular companies engaged in interstate commerce necessarily represents an impermissible burden upon it. In Exxon Corp. v. Governor of Maryland, 437 U.S. 117 [98 S.Ct. 2207, 57 L.Ed.2d 91] (1978), in which the Court upheld a Maryland statute banning producers or refiners of petroleum from operating a retail service station within the state, it held:
 
 
 32
 [t]he fact that the burden of state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.... The crux of the appellants' claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered "with the natural functioning of the interstate market either through prohibition or through burdensome regulation." ... We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure of methods of operation in a retail market.... [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.
 
 
 33
 Exxon Corp., 437 U.S. at 127-28, 98 S.Ct. at 2214 (emphasis added; citations omitted); see also Minnesota v. Clover Leaf Creamery, 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981). Similarly, in Hass v. Oregon State Bar, 883 F.2d 1453 (9th Cir.1989), cert. denied, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990), we held that a provision requiring practicing attorneys to purchase malpractice insurance from the state bar association did not represent an excessive burden upon interstate commerce even though it effectively banned all out-of-state firms from selling malpractice insurance to attorneys practicing in Oregon. Hass, 883 F.2d at 1462. We concluded:
 
 
 34
 The resolution does not affirmatively discriminate against interstate insurance transactions on its face; nor does it have such an effect. In-state and out-of-state insurance companies are burdened in exactly the same way--all are effectively prevented from competing with the Bar to provide primary malpractice coverage.
 
 
 35
 Id.
 
 
 36
 B. Choosing the Appropriate Standard of Review
 
 
 37
 Thus, in determining whether the Buck line of cases governs this claim or whether the Pike test should instead be applied, it is clear that we must consider the purpose of the state regulation as well as its effects. If the primary purpose of the regulation is to regulate interstate commerce and thus to invade the province of Congress, or if the regulation favors in-state interests over out-of-state interests, then it will generally be subject to rigorous constitutional scrutiny.[8] If, however, the regulation in question is designed to address a legitimate local concern and incidentally affects interstate commerce, we must use the Pike balancing test to determine whether the regulation can withstand constitutional scrutiny.
 
 
 38
 It is clear that the regulation in this case falls into the latter category. As we discuss in greater detail below, the regulation was enacted to address a legitimate local concern: ensuring the safe disposal of solid waste in rural areas. See infra pp. 399-400. Congress has explicitly found that the field of solid waste collection is properly subject to state regulation. See 42 U.S.C. Sec. 6901(a)(4) (stating that "the collection and disposal of solid waste should continue to be primarily the function of State, Regional and local agencies"). The Supreme Court has consistently held that a state's power to regulate commerce is at its zenith in areas traditionally of local concern. See, e.g., Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977). In addition, regulations that touch on safety are those that the Court has been most reluctant to invalidate. See Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978).
 
 
 39
 Moreover, this regulation suffers from none of the infirmities that plagued the regulations and statutes invalidated under the Buck line of cases. The regulation does not discriminate against out-of-state interests; in-state and out-of-state firms may both obtain certificates under the regulations. Compare C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, ----, 114 S.Ct. 1677, 1683, 128 L.Ed.2d 399 (1994) (noting that "the essential vice in laws [that discriminate against interstate commerce] is that they bar the import of the processing service") with South Carolina State Highway Dep't v. Barnwell Bros, 303 U.S. 177, 187, 58 S.Ct. 510, 515, 82 L.Ed. 734 (1938) (noting that "the fact that [the regulations] affect alike shippers in interstate and intrastate commerce in large numbers within as well as without the state is a safeguard against their abuse") and Hass v. Oregon State Bar, 883 F.2d 1453, 1462-64 (9th Cir.1989) (upholding a statute because "all providers--whether local or out-of-state--are equally disadvantaged vis a vis the Bar"), cert. denied, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990). In addition, the regulations do not prevent or discourage a firm that has obtained a certificate from processing waste out-of-state, nor do they make doing business in the state of Washington more costly for out-of-state companies relative to in-state firms. Compare C & A Carbone, Inc., --- U.S. at ----, 114 S.Ct. at 1682 (striking down a statute because "it allows only the favored [local] operator to process waste that is within the limits of the town") and Hunt, 432 U.S. at 350-51, 97 S.Ct. at 2445-46 (striking down a regulation because it made the cost of doing business greater for out-of-state companies than for in-state companies) with Exxon Corp., 437 U.S. at 126, 98 S.Ct. at 2214 (holding that a regulation is valid because it "creates no barriers whatsoever against interstate [companies]; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market"). For these reasons, we analyze the constitutionality of the regulation under the Pike balancing test. See Oregon Waste Systems, Inc. v. Department of Environ. Quality of the State of Oregon, --- U.S. ----, ----, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994).
 
 C. Application of the Pike Balancing Test
 
 40
 Before applying the Pike balancing test, we begin by noting the limits of our decision. Kleenwell premised its challenge to the state regulatory scheme entirely upon its belief that a state may not impose a certification requirement upon a waste disposal firm engaged in interstate commerce. It did not contend that the state's refusal to grant it a permit was improper, or that the regulation was invalid, for any reason other than the asserted impact upon interstate commerce. Instead, Kleenwell has consistently maintained that the imposition of a certificate requirement upon an interstate company engaged in the business of collecting, transporting, and disposing of medical waste necessarily represents an overly burdensome regulation upon interstate commerce. Accordingly, we merely evaluate the general structure and purpose of the state's regulatory scheme and do not consider whether the specifics of its operation would withstand constitutional scrutiny.
 
 
 41
 The Pike balancing test recognizes that "incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." City of Philadelphia v. New Jersey, 437 U.S. 617, 623-24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). Accordingly, under the Pike test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (emphasis added).
 
 
 42
 As the party challenging the regulation, Kleenwell must establish that the burdens that the regulation imposes on interstate commerce clearly outweigh the local benefits arising from it. Pacific Northwest Venison Producers v. Smitch, 20 F.3d 1008, 1012 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 297, 130 L.Ed.2d 211 (1994). Kleenwell has not met its burden in this case. First, it has not pointed to the existence of anything more than an incidental burden upon interstate commerce. Second, it has not provided evidence that the effects of the certificate requirement upon interstate commerce are "clearly excessive."
 
 
 43
 In fact, the record contains ample evidence suggesting that a certificate requirement in these circumstances does not violate the Commerce Clause. The central purpose of the WUTC certification and rate regulation scheme is "to protect public health and safety and to ensure solid waste collection services are provided to all areas of the state." RCW 81.77.100. The WUTC found that medical waste poses a significant health risk to the public if not properly processed and that a uniform system of regulation is necessary to protect the public from that danger. It concluded that there is a particular need to ensure service to rural areas at reasonable rates in order to reduce the incentive for illicit dumping in these areas.
 
 
 44
 The WUTC also concluded that the state's certification requirement guards against these risks by preventing "cream-skimming" in urban areas,[9] imposing a common carrier obligation, and regulating the safety practices of companies providing collection services. The regulatory scheme attempts to ensure universal service at reasonable rates by issuing certificates within service territories and by regulating rates to ensure that certified carriers remain financially able to serve all of their customers.[10]
 
 
 45
 The WUTC also made ample findings concerning the problems that can arise from an unregulated market. In addition to outlining the general risks involved when an unregulated collector enters the field of solid waste collection, the WUTC noted specific instances in which an unregulated company entered the market and provided service only to densely populated areas, where the greatest profits could be obtained. As a result, its regulated competitors were unable to provide services to less-populated areas at the current rate. The entry of unregulated companies led regulated companies to decide either to hike their rates in less-populated areas or to discontinue service in those areas. For these reasons, the WUTC made specific factual findings that (1) "unregulated entry would cause unfair and discriminatory pricing and a lack of service in areas of the state, and would result in improper disposal of infectious waste," and (2) "Kleenwell's operations detrimentally impacted universal service by existing biomedical waste collection companies."
 
 
 46
 Indeed, we find this case to be similar in many ways to our decision in Hass v. Oregon State Bar, 883 F.2d 1453, 1462-64 (9th Cir.1989), cert. denied, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990), where we upheld Oregon's requirement that all practicing attorneys purchase malpractice insurance from the state bar association. In Hass, we held that the mandatory participation provision furthered Oregon's legitimate interest in addressing the failures of an unregulated market and in ensuring universal malpractice coverage at a reasonable rate. Because the provision burdened in-state and out-of-state insurance companies in exactly the same way--by preventing both from providing primary malpractice insurance to Oregon attorneys--we held that the benefits arising from the provision outweighed any incidental burdens the provision imposed upon interstate commerce.
 
 
 47
 Similarly, in this case the WUTC found that the challenged regulation serves an important safety concern:[11] by ensuring universal solid waste collection at a reasonable rate, the WUTC protects against the hazards caused by indiscriminate waste disposal by generators of waste unable to obtain collection service. Any burden imposed on interstate commerce by this regulatory scheme is clearly incidental to its main goal of protecting the health and safety of Washington residents. Moreover, the certificate requirement's effect on interstate commerce--preventing free entry and unrestricted competition in the field of solid waste collection--imposes at most an insignificant burden upon interstate commerce. The regulation does not prevent out-of-state carriers from operating within the state, nor does it prevent any carriers from disposing of waste out-of-state.[12] It treats interstate and intrastate carriers identically. Thus, the effect of the regulation is not "clearly excessive" in relation to the substantial local benefits arising from it.[13] Because under the Pike balancing test the state's interest in assuring the health and safety of its citizens clearly outweighs any burdens imposed upon interstate commerce, we hold that the Commerce Clause does not prevent Washington from imposing its certificate requirement.
 
 CONCLUSION
 
 48
 For the reasons outlined above, we hold that the district court did not err in granting the state's motion for summary judgment.[14] In view of our decision as to the merits of Kleenwell's appeal, the request for a preliminary injunction is moot. Accordingly, the district court's decision is
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 RCW 81.77.040 provides that:
 No solid waste collection company shall hereafter operate for the hauling of solid waste for compensation without first having obtained from the commission a certificate declaring that public convenience and necessity require such operations.
 
 
 [2]
 In 1991, the Supreme Court ruled that Commerce Clause violations were actionable under Sec. 1983, resolving a split between the circuits on that issue. See Dennis v. Higgins, 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991)
 
 
 [3]
 As the Supreme Court has pointed out, Younger abstention is a jurisprudential rather than a jurisdictional question; it "does not arise from lack of jurisdiction in the District Court, but from strong policies counseling against the exercise of such jurisdiction...." Dayton Christian Schools, 477 U.S. at 626, 106 S.Ct. at 2722
 
 
 [4]
 The WUTC, acknowledging that appellate courts generally will not consider arguments raised for the first time on appeal, nonetheless argues that we should consider its Younger claim because a change in the law has created a "new issue." See In Re Professional Investment Properties of America, 955 F.2d 623, 625 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992). However, the case upon which the WUTC relies for its argument that a "new issue" has arisen was withdrawn and is no longer relevant to our decision. See Nevada Entertainment Indus. v. City of Henderson, 8 F.3d 1348 (9th Cir.1993) (per curiam), withdrawn, 21 F.3d 895 (9th Cir.1994)
 
 
 [5]
 The Washington Supreme Court also noted the other requirements for collateral estoppel:
 (1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.
 Shoemaker, 745 P.2d at 860 (quoting Malland v. Department of Retirement Systems, 103 Wash.2d 484, 694 P.2d 16 (1985)). As in Shoemaker, these four requirements have been met in this case.
 
 
 [6]
 While we review de novo the district court's grant of summary judgment, Weiser v. United States, 959 F.2d 146, 147 (9th Cir.1992), we review the decision to deny a preliminary injunction under a more deferential standard. Half Moon Bay Fishermans' Marketing Ass'n. v. Carlucci, 857 F.2d 505, 507 (9th Cir.1988)
 
 
 [7]
 Kleenwell's broad interpretation of the Buck line of cases is also undercut by the Buck decision itself. The Supreme Court's holding in Buck hinged upon the fact that the "primary" purpose of the regulation was to inhibit competition. Buck v. Kuykendall, 267 U.S. 307, 315, 45 S.Ct. 324, 325, 69 L.Ed. 623 (1925). Moreover, the Court explicitly noted that "[it] may be assumed that ... appropriate state regulations adopted primarily to promote safety upon the highways and conservation in their use are not obnoxious to the Commerce Clause, where the indirect burden imposed upon interstate commerce is not unreasonable." Id
 
 
 [8]
 The Supreme Court has held that the party challenging the validity of the regulation has the burden of demonstrating that the regulation has a discriminatory purpose or effect. Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). Kleenwell, however, has produced no evidence in support of such a claim. Instead, it has relied entirely upon a Fourth Circuit decision that a similar certificate requirement in North Carolina "directly" burdened interstate commerce and upon the fact that the regulation prevented it from transporting waste in the state. Medigen v. Public Service Comm'n of West Virginia, 985 F.2d 164 (4th Cir.1993)
 
 
 [9]
 Cream-skimming occurs when an unregulated business offers low rates to attract those customers who are the least costly to service, leaving the regulated companies to service the remaining customers. The record reveals that Kleenwell was engaged in this type of activity before the state forced it to cease its operations
 
 
 [10]
 Thus, the regulatory scheme allows certified carriers to subsidize service to rural areas by ensuring them access to more profitable, densely populated areas
 
 
 [11]
 Although the mere invocation of such a purpose cannot shield an overly burdensome regulation from constitutional scrutiny, we note that the Supreme Court has stated that
 regulations that touch upon safety ... are those that "the Court has been most reluctant to invalidate." Indeed, "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." Those who would challenge such bona fide safety regulations must overcome "a strong presumption of validity."
 Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (citations omitted).
 
 
 [12]
 Indeed, the regulation may impose less of a burden upon interstate commerce than the provision in Hass. In Hass, the provision required attorneys to purchase insurance only from the state bar association, an in-state organization. In this case, both out-of-state and in-state firms may compete for the opportunity to transport and process waste in the state of Washington
 
 
 [13]
 The Fourth Circuit appears to have reached a different conclusion in Medigen v. Public Serv. Comm'n of West Virginia, 985 F.2d 164 (4th Cir.1993), where it ruled that West Virginia may not deny a certificate of convenience and necessity to medical waste transporters engaged in interstate commerce. We note, however, that the Fourth Circuit found "no basis in the record ... for concluding that competition in this market has had or will have any destructive effects." Id. at 167. Here, in contrast, there is extensive evidence in the record that supports the WUTC's finding that a regulated market is necessary to protect the health and safety of Washington residents. Indeed, the Fourth Circuit acknowledged that "where competition has destructive effects, regulation may be justified." Id
 
 
 [14]
 Kleenwell asserts that summary judgment may not be granted because it was denied an opportunity to introduce evidence demonstrating that it engaged in interstate commerce. Because our decision is based upon the assumption that Kleenwell is engaged in interstate commerce, the denial does not prevent us from affirming the district court's decision