SHORR, J.
*742 In this review of an order by the Land Use Board of Appeals (LUBA), we first consider whether certain zoning code amendments enacted by the City of Portland violate the dormant Commerce Clause of the United States Constitution. The amendments were designed to stop the expansion of existing fossil-fuel terminals and limit the size of some new terminals within the city. Contrary to LUBA's opinion and order, we conclude that the amendments do not violate the dormant Commerce Clause. The other issues, more traditional to land use disputes, are whether the amendments are inconsistent with Statewide Planning Goal 2, OAR 660-015-0000(2), and Statewide Planning Goal 12, OAR 660-015-0000(12). As to those issues, we conclude, first, that LUBA's order is not unlawful in substance when it concludes that the amendments violated Goal 2. However, we conclude that the portion of LUBA's order indicating that the city did not comply with Goal 12 is unlawful in substance. As a result, we reverse LUBA's opinion and order as it relates to the dormant Commerce Clause and Goal 12 and otherwise affirm.
THE BASIC PROCEDURAL HISTORY
The city and Columbia Riverkeeper (Riverkeeper), among others, petition for judicial review of a LUBA order that reversed City Ordinance No. 188142 (the ordinance).[1] That ordinance amends the city's zoning code and, with some exceptions, prohibits new fossil-fuel terminals and caps the size of existing terminals within the city.[2] After the city enacted the ordinance, respondents, including the Columbia Pacific Building Trades Council (Columbia Pacific), appealed to LUBA. Among other things, Columbia Pacific argued that the amendments violate the dormant Commerce Clause and are inconsistent with Statewide Planning Goals 2 and 12. LUBA, sitting as a one-member *743 panel,[3] agreed and concluded that the amendments violate the dormant Commerce Clause and Goals 2 and 12.
THE BACKGROUND FACTS AND AMENDMENTS
We begin with a background of the relevant material facts and the amendments. The *262 following facts and background are taken from the LUBA opinion,[4] the relevant city ordinance, the amendments, and the Portland City Council resolution.
Portland is one of the largest ports on the West Coast, located at the confluence of the Columbia and Willamette Rivers. In 2015, there were industry proposals to build large fuel distribution terminals in the Pacific Northwest, including in an industrial area of the city, to facilitate the distribution of fossil fuels throughout the West Coast and to export markets. Besides Portland, there were proposals to build at least eight other large export terminals in other parts of the Pacific Northwest for distribution to export markets.
In November 2015, the Portland City Council unanimously passed Resolution 37168. Because of the city council's concerns regarding, among other things, (1) the risks of the location of fossil-fuel infrastructure in an earthquake zone and (2) reducing the city's contribution to greenhouse gasses, pollution, and climate change, the city council stated that it would "actively oppose expansion of infrastructure whose primary purpose is transporting or storing fossil fuels in or through Portland or adjacent waterways." The resolution directed the Bureau of Planning and Sustainability (BPS) to develop proposed zoning code amendments to advance the policies in the resolution.
Relatedly, in June 2016, the city adopted a new comprehensive plan. That plan included a new policy, Policy 6.48, which states that it is city policy to "[l]imit fossil fuel distribution and storage facilities to those necessary to serve the regional market." That policy did not take effect until January 2018. However, the city cited it as guidance when adopting the amendments.
*744 In response to Resolution 37168, BPS prepared the draft amendments and the city council then unanimously adopted them with some changes. The amendments amend the city zoning code to create a new land use category called "Bulk Fossil Fuel Terminals." The amendments identify the areas in which bulk fossil-fuel terminals are permitted. The amendments permit all "Existing Bulk Fossil Fuel Terminals," but those facilities cannot expand beyond the storage capacity that they had as of the effective date of the amendments. The amendments also prohibit new "Bulk Fossil Fuel Terminals," essentially prohibiting new fossil-fuel terminals that store more than two million gallons of fossil fuel, but permitting those that store two million gallons or fewer. There are seven exceptions, discussed later in this opinion, that permit the construction of new bulk terminals that hold more than two million gallons. Those exceptions include allowances for construction of new bulk terminals in places like airports that store airplane fuel, retail gas stations, and terminals built for distributors and wholesalers who receive and deliver fuel solely by trucks.
The existing terminals consist of 10 petroleum terminals and one natural gas terminal clustered in industrial northwest Portland. Those are centrally located near the terminus of the Olympic Pipeline, which delivers petroleum products from refineries in the Puget Sound that are bound for markets in Oregon and southwest Washington. The terminals sit in an area that is in a moderate- to high-risk earthquake liquefaction zone. In enacting the amendments, the city noted that Portland had experienced numerous earthquakes in the past, ranging from magnitude 4.5 to 9.0, and that it is certain to experience seismic events in the future. Many of the individual storage tanks were built before seismic design requirements were adopted.
The existing terminals hold from 11.6 to 67 million gallons and supply approximately 90 percent of the fossil fuel for Oregon. The terminals have approximately 300 tanks that store petroleum products and gas, which are typically transloaded into other modes of transportation (trucks, trains, pipelines) for delivery throughout Oregon. As noted, much of the petroleum and gas coming through Portland is bound for Oregon, but some of the products *745 go outside the state to places such as Washington. While Oregon is an importer of fossil fuels and gas, no fossil-fuel *263 sources or refineries exist either in Portland or more generally in Oregon. As discussed more fully below, Oregon does not have companies or individuals who are competitors in the market for the export of fossil fuels to other states or countries. Oregon is not a participant in that export market.
THE AMENDMENTS DO NOT VIOLATE THE DORMANT COMMERCE CLAUSE
The city and Riverkeeper contend that LUBA erred when it concluded that the amendments violate the dormant Commerce Clause. As discussed below, we agree.
We will reverse a LUBA order if we determine "[t]he order to be unlawful in substance." ORS 197.850(9)(a). The city and Riverkeeper contend that LUBA incorrectly applied the law when it held that the amendments violate the dormant Commerce Clause. Thus we turn to the law. As suggested by its title, the dormant Commerce Clause is not expressly stated in the United States Constitution. The Commerce Clause provides Congress the power "[t]o regulate Commerce * * * among the several States." U.S. Const., Art. I, § 8, cl 3. The dormant Commerce Clause is the negative implication of that provision, as developed through case law, that "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore. , 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).
The dormant Commerce Clause applies equally to state and local laws. C & A Carbone, Inc. v. Clarkstown , 511 U.S. 383, 389, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). When applying the dormant Commerce Clause to a particular local law, "the first step * * * is to determine whether [the law] regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." Oregon Waste Systems, Inc. , 511 U.S. at 99, 114 S.Ct. 1345 (internal quotation marks omitted). "Discrimination" under the dormant Commerce Clause "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Id .
*746 Discriminatory restrictions on commerce are "virtually per se invalid." Id . Nondiscriminatory local laws that have only "incidental" effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc. , 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The burden of demonstrating that a regulation discriminates against interstate commerce "rests on the party challenging the validity" of that regulation. Hughes v. Oklahoma , 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Here, that party is Columbia Pacific.
Thus, the first legal question we must address is whether the amendments differentially treat in-state and out-of-state economic interests such that the amendments benefit the former and burden the latter. The dormant Commerce Clause discrimination analysis examines whether the local regulation discriminates against interstate commerce "either on its face or in practical effect ." Hughes , 441 U.S. at 336, 99 S.Ct. 1727 (emphasis added). Columbia Pacific does not appear to argue before us, and did not contend before LUBA, that the amendments discriminate against interstate commerce on their face. Rather, it contends that the practical effect of the amendments is to discriminate against interstate commerce in a way that violates the dormant Commerce Clause. Accordingly, we examine whether the practical effect of the amendments is to discriminate against interstate commerce in a way that violates the dormant Commerce Clause. We determine that they do not.
To address whether the amendments discriminate in effect, we must define the economic interests at stake because, under the dormant Commerce Clause, "any notion of discrimination assumes a comparison of substantially similar entities." General Motors Corp. v. Tracy , 519 U.S. 278, 298, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (footnote omitted); see also *264 United Haulers Assn., Inc. v. Oneida-Herkimer Solid Waste Management Authority , 550 U.S. 330, 342, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) (stating same). "[I]n the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market, there can be no local preference * * * to which the dormant Commerce Clause may apply." General Motors Corp. , 519 U.S. at 300, 117 S.Ct. 811. *747 Columbia Pacific argued before LUBA, and we understand it to contend before us, that the amendments disfavor out-of-state economic sellers , fossil-fuel refineries and distributors that might build large fossil-fuel export terminals in the city to export fuel through the city to national or international markets beyond just Oregon and regional northwest markets. In contrast, it contends that the amendments favor local, in-state purchasers and end users of bulk fossil-fuel shipments by allowing size exceptions for facilities that serve local end users of fuel. LUBA, in its dormant Commerce Clause analysis, made a somewhat similar comparison, stating that the effect of the amendments was
"to effectively restrict interstate or international commerce in fossil fuels [through Portland], while at the same time shielding its citizens and local end-users to some extent from the adverse consequences of the restrictions on new or expanded terminals."
Columbia Pacific Building Trades Council v. City of Portland , --- Or. LUBA ---- (LUBA No 17-001, July 19, 2017) (Columbia Pacific ) (slip op. at 69-71). As discussed below, that is not an apt comparison of purportedly "substantially similar entities" under the dormant Commerce Clause.
Here, it is inappropriate to compare out-of-state bulk exporters of fossil fuels (refineries and distributors of fuel) to in-state end users of bulk fossil fuels in a claim of economic discrimination. That is not the comparison that the United States Supreme Court has insisted upon when comparing "substantially similar entities" in and out of state. General Motors Corp. , 519 U.S. at 298-99, 117 S.Ct. 811. In Exxon Corp. v. Governor of Maryland , 437 U.S. 117, 125, 98 S.Ct. 2207, 57 L.Ed.2d 91, reh'g den. , 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200 (1978), the Court rejected an argument that a Maryland law discriminated against out-of-state petroleum refiners and producers by prohibiting them from operating their company-owned retail gas stations within the state of Maryland. In rejecting that claim of economic discrimination, the Court stated:
"Plainly, the Maryland statute does not discriminate against interstate goods, nor does it favor local producers and refiners. Since Maryland's entire gasoline supply flows in interstate commerce and since there are no local *748 producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless."
Id.
Columbia Pacific contends that the city discriminates against out-of-state producers and refiners of fossil fuels when compared to the in-state end users of those fuels because the city generally prohibits fossil-fuel terminals that store over 2 million gallons of fuel, which Columbia Pacific contends will effectively prevent producers and refiners from creating an international distribution site, but allows for a number of exceptions that permit end users of fuel in Oregon to store over 2 million gallons of fuel for local use, such as airport storage, agricultural use, and local retail use.[5] We conclude that that cannot constitute discrimination under the dormant Commerce Clause because it is not discrimination between substantially similar out-of-state and in-state economic entities.
A more apt comparison in this case would be to examine how the amendments affect out-of-state versus in-state bulk exporters of *265 fossil fuels. However, even looking at that relationship, the amendments are not discriminatory "in practical effect." As noted, Oregon has no in-state economic entities that are involved in the refining or distribution of fossil fuels. As LUBA correctly recognized, "[t]he city, and Oregon, have no local refineries or sources of fossil fuel to promote or protect against competitors." Columbia Pacific , --- Or. LUBA at ---- (slip op. at 68). As a result, the amendments cannot disfavor out-of-state exporters when compared to "substantially similar" in-state exporters because there are no producers, refiners, or distributors in Portland or Oregon, much less ones that export fuel to national or international markets. See Exxon Corp. , 437 U.S. at 125, 98 S.Ct. 2207 (holding *749 that Maryland law did not discriminate against out-of-state producers and favor in-state ones because there "are no local producers or refiners" to protect).
Columbia Pacific also contends that the amendments violate the dormant Commerce Clause because Portland cannot regulate or effectively prevent "unwanted commerce" from reaching its confines, which Columbia Pacific argues is a form of economic discrimination under the dormant Commerce Clause. LUBA similarly concluded that, even if the amendments are "not a classic form of economic protectionism vis-à -vis out-of-state competitors," the amendments are a "species of protectionism" that improperly shield Portland from certain trade, the national and international export of fossil fuels, that undermines the dormant Commerce Clause. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 70-71).
In support of its contention that it is economic discrimination for states or local governments to bar "unwanted commerce," even if there is no discrimination against out-of-state interests and in favor of in-state interests, Columbia Pacific significantly relies upon Philadelphia v. New Jersey , 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In that case, a New Jersey law, with limited exceptions, banned the import of out-of-state waste for disposal within New Jersey. Id . at 618, 98 S.Ct. 2531. While Philadelphia notes that New Jersey may not isolate itself from the national economy through its laws, it ultimately holds that the New Jersey law violated the dormant Commerce Clause because it discriminated against substantially similar out-of-state and in-state economic interests. Id. at 627-29, 98 S.Ct. 2531. The law barred all waste originating out-of-state from being disposed of in New Jersey land-fills, but allowed disposal of in-state waste. Id . at 629, 98 S.Ct. 2531. The Court concluded that the New Jersey law blocked the importation of out-of-state waste "in an obvious effort to saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites. That legislative effort is clearly impermissible under the Commerce Clause." Id .
We conclude that the amendments in this case do not bar out-of-state commerce from entering or operating *750 within the state in the same manner that that New Jersey law improperly prevented out-of-state commerce from reaching New Jersey in Philadelphia . Unlike in that case, the amendments do not bar the interstate delivery of out-of-state products, here fossil fuels, into Oregon. Indeed, the amendments do not prohibit fuel exports to or through Portland, but place restrictions on the size of certain fuel terminals that may be used as export facilities. As discussed, they also do not discriminate against similarly situated out-of-state and in-state economic interests. As a result, LUBA's conclusion that the amendments violate the dormant Commerce Clause because they discriminate against interstate commerce is unlawful in substance.
Finally, Columbia Pacific contends that the amendments discriminate in violation of the dormant Commerce Clause because United States Supreme Court precedent prohibits states from providing their own consumers advantages over out-of-state consumers. See, e.g. , Camps Newfound/Owatonna, Inc. v. Town of Harrison , 520 U.S. 564, 581, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (holding that a Maine property tax exemption that favored camps that served mostly local residents and penalized camps that had almost all out-of-state campers facially discriminated against interstate commerce). But, as with the analysis above, those cases consider the *266 effect of the state or local statute on similarly situated economic actors-i.e. , in-state and out-of-state consumers. In Camps Newfound/ Owatonna, Inc. , for instance, the Maine property tax at issue did not tax Maine camps that served largely in-state campers, but did tax Maine camps that served otherwise similarly situated out-of-state campers. Id . That resulted in a greater financial burden on out-of-state campers in Maine than on in-state campers. Id. The amendments here do not favor Oregon consumers when compared to out-of-state consumers. They do not regulate the conduct of out-of-state consumers in Oregon, nor do they regulate out-of-state consumers' conduct in their states.
Having concluded that the amendments do not discriminate as that term is understood under the dormant Commerce Clause, we turn to whether the amendments survive the balancing test set forth in Pike .
*751 As noted, nondiscriminatory local laws that regulate "even-handedly to effectuate a legitimate local * * * interest" and have only "incidental" effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike , 397 U.S. at 142, 90 S.Ct. 844. In full, the United States Supreme Court describes the test as follows:
"Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."
Id . (internal citation omitted). Here, the amendments are an exercise of local authority over a particularly local concern, land use regulations regarding the size and location of large fossil-fuel terminals.
LUBA concluded that the amendments impose burdens on interstate commerce that are clearly excessive in relation to the putative local benefits. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 92). We disagree and, in contrast, conclude that Columbia Pacific did not meet its burden to demonstrate that the claimed burdens on interstate commerce are clearly excessive in relation to the putative local benefits.
The burden remains on Columbia Pacific, as the party challenging the local law, to demonstrate that any burden imposed by the law on interstate commerce is clearly excessive in relation to the putative local benefits. See, e.g. , Kleenwell Biohazard Waste and General Ecology Consultants, Inc. v. Nelson , 48 F.3d 391, 399 (9th Cir), cert. den. , 515 U.S. 1143, 115 S.Ct. 2580, 132 L.Ed.2d 830 (1995) (stating same); cf. Shaffner et al. v. City of Salem et al. , 201 Or. 45, 52-53, 268 P.2d 599 (1954) (stating that local zoning ordinances have a presumption of validity and reasonableness and the burden is on the challenging party to show the ordinance is invalid or unconstitutional).
*752 As an initial matter, we conclude that the amendments provide legitimate putative local benefits, which include limiting the number of very large fossil-fuel terminals in a moderate- to high-risk earthquake liquefaction zone.[6] The amendments also seek to reduce the risk of potential explosions, accidents, and fire at large fossil-fuel terminals and to reduce the similar risk of a catastrophic accident from the larger trains that transport fossil fuels to the terminals. In addition, the amendments seek to protect local public health and limit exposure to coal containing heavy metals linked to cancer, birth defects, and other problems. In considering the amendments, the city noted the recent 2016 derailment of a train carrying oil through the Columbia Gorge, which led to a large oil spill, fire, and the evacuation of a significant portion of the city of Mosier. Of course, as LUBA noted, a significant degree of that risk remains because the city will still have existing fossil-fuel terminals that hold up to 67 million gallons, new terminals with a *267 2 million gallon capacity, and some new, larger terminals allowed by the city's exceptions. However, the amendments do seek to "effectuate[ ] legitimate local public interest[s]" in placing some limits on the extent of that risk and seeking to promote local health and safety.[7] "[H]ealth and safety considerations [may] be weighed in the process of deciding the threshold question whether the conditions entailing [the] application of the dormant Commerce Clause are present." General Motors Corp. , 519 U.S. at 307, 117 S.Ct. 811.
In applying the Pike test, the difficulty arises upon reaching the second step of the test, which involves assessing whether any burdens that the amendments impose on interstate commerce are clearly excessive in relation to the *753 putative local benefits, and whether the local interest could be promoted through some lesser burden on interstate commerce. However, as LUBA noted:
"It is difficult to evaluate how much of a burden the city's prohibition on new or expanded FFTs would have on the establishment of new export terminals, or on the flow of fossil fuels into and through any future export terminals in the city or region, because the record contains no attempt to conduct that evaluation ."
Columbia Pacific , --- Or. LUBA at ---- (emphasis added) (slip op. at 87). In so concluding, LUBA placed the burden on the city to prove that the burden on interstate commerce is not clearly excessive in comparison to the local putative benefits. As noted, under the dormant Commerce Clause analysis, Columbia Pacific bears the burden of creating a record to demonstrate that the burdens on interstate commerce are clearly excessive in relation to the putative local benefits. Kleenwell Biohazard Waste and General Ecology Consultants, Inc. , 48 F.3d at 399.
There is some discussion in the record that there was a prior proposal to locate a large propane gas terminal in Portland, later abandoned due to local opposition. There is also a reference to a number of proposals for large-scale petroleum, gaseous fuels, and coal terminals and facilities outside the city in other parts of the Northwest region, including in Washington. But there is no record developed to demonstrate how, presuming that they would be built in the city, the absence of large fossil-fuel terminals used for international or national export purposes in industrial land in the city would affect interstate commerce in fossil-fuel distribution or how that burden, to the extent demonstrated, compares to the local benefits in reducing the risks associated with the large terminals used to facilitate that trade.[8]
*754 Absent such a showing, Columbia Pacific has not met its burden to demonstrate that the amendments are unconstitutional under Pike . For that reason as well, we disagree with LUBA that the amendments violate the dormant Commerce Clause and conclude that its order on that matter is "unlawful in substance." ORS 197.850(9)(a).
*268 LUBA DID NOT ERR WHEN IT CONCLUDED THAT THE AMENDMENTS DO NOT COMPLY WITH GOAL 2
The city and Riverkeeper next contend that LUBA erred in concluding that the city's decision was not supported by an "adequate factual base" as required by Goal 2. Specifically, they argue that LUBA erred when it concluded that a portion of Finding 21 in the amendments lacked the requisite adequate factual base. We reject that argument because, under our standard of review, LUBA's opinion on this point was not "unlawful in substance." ORS 197.850(9)(a).
Finding 21 states:
"The potential impacts of the code amendments on constraining the fossil fuel supply to meet regional demand is uncertain. Fossil fuel demand in this growing region has been relatively flat over the last 15 years. At best, the demand for fossil fuel may increase moderately, as indicated by trend-based forecasts, or may plateau and decline with a continued shift to other modes of transportation, more fuel *755 efficient vehicles, electric vehicles, and other carbon reduction strategies."
Before LUBA, Columbia Pacific argued that that finding was essential to the city's decision not to allow expansion of existing bulk fossil-fuel terminals and that the specific finding that use of fossil fuels may "plateau and decline" with a continued shift to other modes of transportation, more fuel efficient vehicles, electric vehicles, and other carbon reduction strategies was not supported by an adequate factual base as required by Goal 2. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 55). LUBA agreed with Columbia Pacific, concluding that Finding 21 was "key support for the prohibition on any expansion of existing terminals to meet *** local or regional needs" and its conclusion that fossil-fuel use "may plateau and decline" was "not supported by substantial evidence, and hence not supported by an adequate factual base." Id. at ---- (slip op. at 57).
In coming to those conclusions, LUBA examined the parts of the record that the city and Riverkeeper argued-both to LUBA and us-support Finding 21. Id. at ---- (slip op. at 55-56). After reviewing that evidence, LUBA concluded that, "while [it] suggest[ed] that future demand for fossil fuel over the region or state may be lower than earlier projections or historical increases," it did not "suggest[ ] that the demand may plateau or decline" with the implementation of climate resilience goals and strategies. Id. at ---- (slip op. at 56). As a result, LUBA noted that Finding 21 "essentially ignore[s] uncontradicted projections of moderate growth in demand for fossil fuels, and instead rel[ies] on what are no more than unsupported speculations that demand will actually plateau or decline" as justification for not allowing expansion of existing fossil-fuel terminals. Id. at ---- (slip op. at 57).
"Goal 2 *** requires that land use decisions have an 'adequate factual base.' " 1000 Friends of Oregon v. LCDC , 244 Or. App. 239, 268 n 11, 259 P.3d 1021 (2011). "[A]n 'adequate factual base' is synonymous with the requirement that a decision be supported by substantial evidence." Id . When reviewing a record for substantial evidence, LUBA asks whether "the local government's decision *** is based on facts that are *** supported by substantial evidence in the whole record." Stevens v. City of Island City , 260 Or. App. 768, 772, 324 P.3d 477 (2014) (internal quotation marks omitted). That means, LUBA must decide "[i]f, viewing the record as a whole, a reasonable person could make the disputed factual finding." Id. Only then is the finding "supported by substantial evidence." Id.
*756 Our judicial review is more limited. We review "LUBA's application of the substantial evidence rule for legal correctness and do [ ] not review the evidence independently for substantiality." Reinert v. Clackamas County , 286 Or. App. 431, 446, 398 P.3d 989 (2017). Thus, where LUBA "properly articulates the substantial evidence standard of review, we will affirm unless the evidence is so at odds with [LUBA's] evaluation that we can infer that [LUBA] misunderstood or misapplied the proper standard." Barkers Five, LLC v. LCDC , 261 Or. App. 259, 348, 323 P.3d 368 (2014) (internal quotation marks omitted).
*269 Turning back to this case, we conclude that LUBA articulated and applied the correct legal standard. In its opinion, LUBA noted that, to comply with the "adequate factual base" requirement of Goal 2, a land use decision must be "supported by substantial evidence, i.e. , findings of fact supported by evidence in the record which, viewing the record as a whole, would permit a reasonable person to make that finding." Columbia Pacific , --- Or. LUBA at ---- (slip op. at 53). As a result we must turn to the evidence in the record to determine if it is "so at odds with [LUBA's] evaluation that we can infer that [LUBA] misunderstood or misapplied" that standard. Barkers Five, LLC , 261 Or. App. at 348, 323 P.3d 368 (internal quotation marks omitted). Applying that standard here, we conclude that nothing in the record is "so at odds with" LUBA's decision that we can infer that LUBA misunderstood or misapplied the substantial evidence standard. Significantly, the only evidence in the record projecting future fossil-fuel demand cited to us by either party or LUBA are trend-based forecasts indicating that demand will moderately increase over time. As a result, we conclude that LUBA's opinion is not "unlawful in substance" as it relates to Goal 2. ORS 197.850(9)(a).
On judicial review, the city and Riverkeeper present three additional arguments as to why LUBA's decision regarding Goal 2 was flawed. First, Riverkeeper argues that LUBA incorrectly concluded that the city's finding that demand for fossil fuel may plateau and decline over time was not supported by substantial evidence because, in Finding 21, the city also recognized that projecting fossil-fuel demand was uncertain and that trend-based forecasts indicated that *757 fossil-fuel demand may in fact rise instead. Second, the city and Riverkeeper argue that LUBA's decision was unlawful in substance because it placed undue weight on the city's conclusion regarding fossil-fuel demand. Specifically, they argue that, because the city's decision was also based on other findings that were supported by substantial evidence, the fact that one of the city's factual findings was not supported by substantial evidence does not mean the whole decision was not supported by substantial evidence. Third, Riverkeeper argues that LUBA's decision on Goal 2 is totally derivative of other arguments and, thus, does not provide an independent basis for remand. For the reasons discussed below, we reject all of those arguments.
First, we reject Riverkeeper's argument that the city's finding that demand for fossil fuels may plateau and decline over time was supported by substantial evidence because, in Finding 21, the city also recognized that trend-based forecasts in the record contradicted that conclusion. As we have previously noted, those trend-based forecasts are the only evidence projecting future fossil-fuel demand in the record. Recognizing that countervailing evidence exists cannot, by itself, overcome a substantial evidence challenge. See Barkers Five, LLC , 261 Or. App. at 362, 323 P.3d 368 (noting that an LCDC decision indicating that a county decision was supported by substantial evidence was unlawful in substance where, although LCDC recognized that there was "weighty, countervailing evidence," it disregarded that evidence by relying upon "speculative reasoning"). If a locality recognizes that evidence contradicting its decision exists and disregards it based upon "speculative reasoning," that decision lacks substantial evidence. Id.
That is exactly what happened in this case. The city recognized the "trend-based forecasts" in the record that projected a moderate increase in fossil-fuel demand. However, it disregarded that evidence, concluding instead that demand for fossil fuels may plateau or decrease over time based on a shift to other transportation methods and away from fossil-fuel usage. While the city may, in fact, be correct that demand for fossil fuels may plateau or decline in the region based on a shift to other transportation and away from fossil fuel usage, the city fails to point to anything *758 in the record that indicates that that may actually be the case. Other factors besides technological advances, such as population growth and changes in the import and export of goods in a region, affect fossil-fuel demand. Further, as Columbia Pacific correctly points out, the city made no effort to address whether the trend-based forecasts in the record already accounted for shifts in technology. Without any evidence in *270 the record indicating how technological changes interact with those other factors to affect fossil-fuel demand, the city's conclusion is merely speculative, and no "reasonable person could make" that factual finding. Stevens , 260 Or. App. at 772, 324 P.3d 477. As a result, given that recognizing countervailing evidence alone does not bring a decision within the auspices of "substantial evidence," we cannot conclude that LUBA's decision was "unlawful in substance" when LUBA determined that, despite that recognition, the city's finding was not supported by substantial evidence.
We similarly reject the city and Riverkeeper's argument that LUBA's decision is unlawful in substance because it places undue weight on the city's conclusion that "demand for fossil fuel may *** plateau and decline." According to the city and Riverkeeper, the city's decision to limit expansion of existing terminals and to cap the size of new terminals was supported by a number of factors other than the finding that demand for fossil fuel may plateau or fall. They point to evidence demonstrating that the city also considered safety, health, livability, and the industry's reluctance to retrofit seismically existing fossil-fuel terminals as additional support for the city's decision to restrict expansion of existing fossil-fuel terminals and cap the size of new terminals. As a result, they argue that the city's decision is supported by substantial evidence because no one disputes that the city's findings regarding those additional factors are supported by substantial evidence.
As we have noted, "[w]hen reviewing a land use decision, LUBA may reverse or remand the local government's decision if the decision is based on facts that are not supported by substantial evidence in the whole record." Stevens , 260 Or. App. at 772, 324 P.3d 477 (internal quotation marks omitted; emphasis added). As noted, that means that, "[i]f, viewing the record as a whole, a reasonable person could make the disputed *759 factual finding , then the finding is supported by substantial evidence." Id. (emphasis added). As a result, where a local government made a decision that is based on a critical finding that was not supported by substantial evidence, regardless of whether other adequately supported findings were also relied upon in making that decision, LUBA is required to reverse and remand that decision. See Barkers Five, LLC , 261 Or. App. at 362, 323 P.3d 368 (holding that, "although the designation of land as urban reserve must be based on consideration of * * * factors, which requires, among other things, that the factors are weighed and balanced as a whole" and "although Metro and the counties need not demonstrate 'compliance' with any [one] factor," a land use decision still lacked substantial evidence where just one of those factors was weighed based on "speculative reasoning" in the face of "weighty, countervailing evidence squarely at odds" with that reasoning). LUBA's decision is not "unlawful in substance" insofar as LUBA correctly concluded that the decision lacked substantial evidence where that decision was made based on a finding that was not supported by substantial evidence.
Finally, we reject Riverkeeper's argument that LUBA's decision on Goal 2 is totally derivative of other arguments in other assignments of error and, thus, does not provide an independent basis for remand. Riverkeeper's argument is based on statements in LUBA's opinion indicating that, because of the city's "unique geographic and logistical position with respect to regional, statewide, interstate and international markets in fossil fuels," "the city has obligations" under Goal 12 and the Commerce Clause "to ensure that its plan and zoning regulations comply with the obligation to facilitate the flow of goods within the region and statewide" and that the city only purported to evaluate and address the local or regional flow of goods. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 56-57). However, LUBA indicated that its holding regarding Goal 2 did not rely on that reasoning, stating, "even focused exclusively on the local or regional demand, the findings essentially ignore uncontradicted projections of moderate growth in demand for fossil fuels," and that, as a result, the city's findings on local and regional demand, which were "key support for the prohibition on any expansion of existing terminals," were "not supported by *760 substantial evidence." Id. at ---- (slip op. at 57). Accordingly, because the *271 reasoning to which Riverkeeper objects is dictum , Riverkeeper's argument that LUBA's holding on Goal 2 is derivative and, thus, does not provide an independent basis for reversal and remand is unconvincing. Accordingly, we reject that argument as well.
LUBA's opinion is not "unlawful in substance" insofar as LUBA held that the city's finding that fossil-fuel demand may plateau and decrease over time was not supported by an "adequate factual base" as required by Goal 2. Accordingly, we affirm LUBA's conclusion that the amendments do not comply with Goal 2.
LUBA ERRED WHEN IT HELD THAT THE AMENDMENTS DO NOT COMPLY WITH GOAL 12
Finally, the city and Riverkeeper argue that LUBA erred when it held that the amendments did not comply with Goal 12. Specifically, they argue that, absent a showing that a land use regulation significantly affects a transportation facility under OAR 660-012-0060, Goal 12 does not apply to that land use regulation. In response, Columbia Pacific argues-as LUBA concluded in its opinion-that OAR 660-012-0060 is narrower than Goal 12 and, thus, a land use amendment can comply with OAR 660-012-0060 and still violate Goal 12. We agree with the city and Riverkeeper and, accordingly, reverse LUBA's order because, insofar as it discusses Goal 12, the order is "unlawful in substance." ORS 197.850(9)(a).
LUBA concluded that the fossil-fuel terminals subject to the amendments are "transportation facilities" under Goal 12 and OAR 660-012-0060. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 29). LUBA then concluded that, although the fossil-fuel terminals are transportation facilities, the amendments do not "significantly affect an existing or planned transportation facility" under OAR 660-012-0060. Id. at ---- (slip op. at 37, 41). Nonetheless, LUBA concluded that the amendments violated Goal 12 because "there [was] no indication in the city's decision or in the record that the city *** evaluated [the] considerations" specified in Goal 12. Id. at ---- (slip op. at 44).
*761 Specifically, LUBA noted that, even though the amendments-unquestionably land use regulations-did not "significantly affect an existing or planned transportation facility" under OAR 660-012-0060, the city was still required to address Goal 12 because "[a] plan or zoning amendment that changes the zoning classification for a specific type of transportation facility, particularly one that has regional and statewide significance, could potentially affect whether the local [transportation plan] remains in compliance with applicable Goal 12 *** requirements that are in addition to those imposed under OAR 660-012-0060." Id. at ---- (slip op. at 43). LUBA was especially focused on the fact that OAR 660-012-0060"is not particularly concerned *** with [the] Goal 12 *** requirements intended to facilitate the safe, efficient and economic flow of freight and other goods and services within regions and throughout the state through a variety of modes including road, air, rail and marine transportation." Id. at ---- (internal quotation marks and brackets omitted) (slip op. at 42).
LUBA's opinion and order is at odds with the plain text of Goal 12 and OAR chapter 660, division 12 (the Transportation Planning Rule or TPR). The text of Goal 12 states, "A transportation plan shall * * * facilitate the flow of goods and services so as to strengthen the local and regional economy." (Emphasis added.) Thus, Goal 12 is applicable only when a transportation or transportation system plan (TSP) is affected by a regulation. Here, neither the parties nor LUBA dispute that the amendments are not regulations that directly alter a TSP. Thus, for Goal 12 to apply, the amendments must be in some way inconsistent with the city's TSP. See Woodard v. City of Cottage Grove , 225 Or. App. 282, 294-95, 201 P.3d 210, rev. den. , 346 Or. 362, 211 P.3d 931 (2009) (noting that a "plan inconsistency" identified under OAR 660-012-0060"creates [the] need * * * to evaluate [the land use regulation] under the policies of Goal 12").
The Department of Land Conservation and Development (DLCD) created the TPR to implement Goal 12. OAR 660-012-0000 ; see also *272 1000 Friends of Oregon v. Yamhill County , 203 Or. App. 323, 328, 126 P.3d 684 (2005) ( "OAR chapter 660, division 12, sets out rules implementing Goal 12, the 'Transportation' goal."); *762 Citizens Against Irresponsible Growth v. Metro , 179 Or. App. 12, 22 n 11, 38 P.3d 956 (2002) ("OAR 660, division 12, is a *** rule compilation that implements Goal 12."). The TPR requires cities and counties to adopt local TSPs that comply with the TPR. OAR 660-012-0015(3). The TPR also requires that all TSPs comply with Goal 12. OAR 660-012-0025(2). Finally, the TPR requires periodic review of TSPs to ensure continued compliance with the TPR-including continued compliance with Goal 12. OAR 660-012-0055(6).
Within the TPR, DLCD also contemplated a way to identify land use regulations that are inconsistent with, and thus affect, a locality's adopted TSP between periodic reviews- OAR 660-012-0060. See Woodard , 225 Or. App. at 294-95, 201 P.3d 210 (" OAR 660-012-0060 regulates amendments to the comprehensive plan or land use regulations that are inconsistent with functional classification or performance standards of a transportation facility that are part of the transportation *** plan."). OAR 660-012-0060(1) provides that, "[i]f *** a land use regulation *** would significantly affect an existing or planned transportation facility, then the local government must put in place measures as provided in *** this rule, unless the amendment is allowed under [other sections] of this rule." It goes on to note that a land use regulation "significantly affects a transportation facility if it would *** [d]egrade the performance of an existing or planned transportation facility such that it would not meet the performance standards identified in the TSP or comprehensive plan." OAR 660-012-0060(2)(c)(B).
As noted, all TSPs must comply with Goal 12. OAR 660-012-0025(2). As a result, "the performance standards" of an "existing or planned transportation facility" "identified in [a] TSP" must, by law, comply with all of Goal 12's requirements. That includes the specific Goal 12 requirement that concerned LUBA in this case-i.e. , that the TSP "facilitate the flow of goods and services so as to strengthen the local and regional economy." As a result, if a land use regulation does not "[d]egrade the performance of an existing or planned transportation facility such that it would not meet the performance standards identified in the TSP or comprehensive plan," as LUBA concluded the amendments did not in this case, that regulation also necessarily must *763 not degrade those transportation facilities' ability to "facilitate the flow of goods and services so as to strengthen the local and regional economy" in a way that violates Goal 12. As a result, LUBA's order is unlawful in substance insofar as it concludes that the amendments do not degrade the performance of an existing or planned transportation facility such that it would not meet the performance standards identified in the TSP in violation of OAR 660-012-0060, but also "potentially affect whether the local TSP remains in compliance with" Goal 12. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 43). Therefore, we must reverse LUBA's decision regarding Goal 12.
CONCLUSION
In sum, LUBA's opinion is unlawful in substance insofar as it incorrectly concludes that the amendments violate the dormant Commerce Clause. Further, the opinion is also unlawful in substance insofar as it concludes that the amendments comply with OAR 660-012-0060, but do not comply with Goal 12. However, LUBA's decision is not unlawful in substance in determining that the amendments do not comply with Goal 2. Accordingly, on both Riverkeeper's and the city's petitions, we reverse and remand LUBA's order with respect to their assignments of error pertaining to the dormant Commerce Clause and Goal 12, but affirm with respect to Goal 2.
Reversed and remanded in part.

The city and Riverkeeper filed separate petitions for judicial review. However, because they raise the same assignments of error to LUBA's order, we do not distinguish between the two petitions in our analysis.

The amendments are formally known as the Fossil Fuel Terminal Zoning Amendments.

The two other LUBA members did not participate in the decision.

Columbia Pacific Building Trades Council v. City of Portland , --- Or. LUBA ---- (LUBA No 17-001, July 19, 2017).

The exceptions are fossil-fuel storage for (1) freight terminals that have storage capacity of 2 million gallons or less and that do not have transloading facilities; (2) gasoline stations and other retail distributors of fossil fuels; (3) distributors and wholesalers that receive and deliver fossil fuels exclusively by truck; (4) industrial, commercial, institutional, and agricultural firms that exclusively store fossil fuel for use as an input; (5) uses that involve the transfer or storage of solid or liquid wastes; (6) exclusive use at an airport, surface passenger terminal, marine, truck or air freight terminal, rail yard, or as part of a fleet vehicle servicing facility; and (7) uses that recover or reprocess used petroleum products.

Portland's riverfront plateau areas, which account for over 90 percent of its industrial-zoned land, have a high susceptibility for soil liquefaction.

The city and Riverkeeper contend that the city's interest in reducing its contribution to climate change and effecting broader environmental interests are legitimate local interests. LUBA concluded that the city's efforts to restrict the city from becoming a national or international export site for fossil fuels, with the apparent goal of limiting greenhouse gasses elsewhere, was not a legitimate local interest. Columbia Pacific , --- Or. LUBA at ---- (slip op. at 86). We do not decide whether the city's interest in restricting the use of its land to prevent potential large fuel-export facilities and, thus, possibly reduce greenhouse gasses, is a legitimate local interest. Rather, we conclude that the amendments have other legitimate putative local health, safety, and land use benefits as discussed above.

As noted above, existing bulk fossil fuel terminals and fossil-fuel terminals that store up to 2 million gallons continue to be permitted. While not an ideal structure, the existing terminals could, of course, be used for international or national export purposes even if they are currently used for regional distribution. The dormant Commerce Clause protects the interstate market and not "the particular structure or methods of operation in a *** market." Exxon Corp. , 437 U.S. at 127-28, 98 S.Ct. 2207. "There is no constitutional right to do business in a[n] *** optimally profitable *** configuration" if the resulting operation burdens local land-use-planning interests. Wal-Mart Stores, Inc. v. City of Turlock , 483 F.Supp.2d 987, 1012 (E.D. Cal. 2006). Regardless, we need not decide whether the amendments burden the interstate market as opposed to only burdening particular structures or methods of operation. Columbia Pacific has not presented a record or met its burden to demonstrate the extent of any burdens on interstate commerce or how any such burdens are clearly excessive to the putative local benefits.